UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | CAUSE NO. 1:15-cr-165-TWP-DKL |
| | ) | |
| RUSSELL TAYLOR, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S MOTION FOR CONTINUED DETENTION
PURSUANT TO 18 U.S.C. § 3142**

The Government moves that the defendant, Russell Taylor (the "Defendant"), continue to be detained pending further proceedings in this case as there are no conditions or combinations of conditions that can reasonably assure the Defendant's appearance at trial or the safety of the community at large.  In support of this motion, the Government states that by clear and convincing evidence, the Defendant poses a risk of danger to the community, and by a preponderance of the evidence, the Defendant is a risk of flight.

**Legal Standard**

When a motion for pretrial detention is made, the Court engages a two-step analysis. First, the judicial officer determines whether one of eight conditions exists for considering a defendant for pretrial detention.  Second, after a hearing, the Court determines whether the standard for pretrial detention is met.  *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988). A defendant may be considered for pretrial detention in only eight circumstances – when a case involves one of six types of offenses or two types of risks.  One of these circumstances is where the defendant has been charged with any felony "that involves a minor victim."  18 U.S.C. § 3142(f)(1)(E).  A defendant is also eligible for detention upon motion by the United States or the

Court *sua sponte*, in cases involving:  (1) a serious risk that the person will flee; or (2) a serious risk that the defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, a prospective witness or juror.  18 U.S.C. § 3142(f)(2).  *United States v. Sloan*, 820 F.Supp. 1133, 1135-36 (S.D. Ind. 1993).

Once it is determined that a defendant qualifies under any of the eight conditions of § 3142(f), a court may order a defendant detained before trial if the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.  18 U.S.C. § 3142(e).  Detention may be based on a showing of either dangerousness or risk of flight.  Proof of both is not required.  *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir. 1985).

A rebuttable presumption that no condition or combination of conditions will reasonably assure the defendant's appearance or the safety of any other person and the community arises when the judicial officer finds that there is probable cause to believe that the defendant committed an offense involving a minor victim under statutes including 18 U.S.C. § 2251 or § 2252(a)(2).  18 U.S.C. § 3142(e)(3)(E).  Once the presumption is invoked, the burden of production shifts to the defendant.  *United States v. Holguin*, 791 F.Supp.2d 1082, 1087 (D.N.M. 2011) (quoting *United States v. Stricklin*, 932 F.2d 1353, 1354–55 (10th Cir.1991)).  Should the defendant satisfy his or her burden of production, then the United States must show by a preponderance of the evidence that the defendant presents a risk of flight, or show by clear and convincing evidence that the defendant presents a danger to the community.  *See United States v. Portes*, 786 F.2d 758, 765 (7th Cir. 1985); 18 U.S.C. § 3142(e).  Notably, however, even if the defendant meets his burden of production, "the presumption remains a factor for consideration

2

by the district court in determining whether to release or detain." *United States v. Stricklin*, 932 F.2d 1353, 1355 (10th Cir. 1991).

"A pretrial detention hearing is not intended to serve as a vehicle for discovery from the government." *United States v. Suppa*, 799 F.2d 115, 120 (3rd Cir. 1986). Further, "it is appropriate to consider challenged evidence in detention hearings." *United States v. Apker*, 964 F.2d 742, 744 (8th Cir. 1992) (citing 18 U.S.C § 3142(f) and noting that rules concerning the admissibility of evidence in criminal trials do not apply in detention hearings); *United States v. Angiulo*, 755 F.2d 969, 974 (1st Cir. 1985) (challenged information obtained via electronic surveillance may be considered regarding detention at least unless or until the court determines the information was illegally obtained).

**Facts and Argument**

The Defendant has been charged with 12 counts of sexual exploitation of a child, in violation of 18 U.S.C. § 2251(a), and 1 count of conspiracy to distribute and receive child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). These charges create a rebuttable presumption in favor of detention. Moreover, by issuing the complaint in this case, the Court found probable cause to believe the Defendant violated §§ 2251(a) and 2252(a)(4)(B). As a result, the burden is on the Defendant to attempt to rebut the presumption of detention.

Even if the Defendant is able to rebut the presumption, the Defendant should still be detained because an analysis of the factors set forth in 18 U.S.C. § 3142(g) indicates that detention is proper.

**1.      Nature and Circumstances of the Offense**

As an initial matter, the Defendant has been charged with offenses, including multiple counts of sexual exploitation of a child, which are charges that Congress has said *must* be

3

considered on the issue of pretrial detention. The Defendant's minor victims were either members of the Defendant's family or friends of those family members. Several of those victims have disclosed to the Government instances of hands-on sexual abuse by the Defendant, and all of the victims have disclosed fear should the Defendant be released on conditions.

Specifically, Minor Victim 1, a relative-in-law of the Defendant, has been interviewed and stated that she had sexual contact with the Defendant on approximately 5 separate occasions when she was 15 and 16 years old.[1] Each time Minor Victim 1 had sexual contact with the Defendant, or with another adult in the Defendant's home, Minor Victim 1 was paid in cash by the Defendant. Video of some of these instances exists and was shown to Minor Victim 1, who identified herself, the Defendant, and other individuals in these videos. Minor Victim 1 was recorded without her knowledge or consent for the Defendant's sexual enjoyment. As if that were not enough, the Defendant further abused Minor Victim 1 by distributing one of these videos to Jared Fogle.

In one of the videos, Minor Victim 1 and Minor Victim 2, a friend of Minor Victim 1, are performing oral sex on the Defendant. Minor Victim 1 identified herself, the Defendant, and Minor Victim 2 in this video. Minor Victim 1 told investigators that, on this specific occasion, in order to pay Minor Victim 1 and Minor Victim 2, the Defendant drove them to an ATM at a Flying J truck stop at S.R. 37 and I-465 on the south side of Indianapolis and withdrew $200 from the ATM. The Defendant gave the cash to Minor Victim 1, who split it with Minor Victim 2.

---

[1] Hidden camera videos exist of at least 2 of these occasions and verifies the veracity of Minor Victim 1's statements.

4

Minor Victim 2 was also shown this video and identified herself, Minor Victim 1, and the Defendant in the video.  Minor Victim 2 corroborated Minor Victim 1's testimony about performing oral sex on the Defendant, the trip to the truck stop, and the cash she received from the Defendant.  Perhaps most significant, though, is the fact that the Defendant himself, in a May 14, 2015 proffer session, admitted to having intercourse with, and receiving oral sex from, Minor Victim 1 and Minor Victim 2.  During that same proffer session, the Defendant also admitted to having intercourse with another friend of Minor Victim 1, however, the Defendant could not remember the victim's full name.

The Defendant's heinous victimization of children who were close to (or who were *related to*) him occurred over a period of years – from roughly 2011 until 2015.  And, even if the Defendant did not have hands-on contact with all of the victims, the Defendant clearly had sexual interest in the victims.  Indeed, the Government found multiple copies of a photograph of the Defendant's erect penis pushed up to a photograph of Minor Victim 5's face.  The Government found a similar photograph of the Defendant's erect penis held up to a photograph of Minor Victim 12's face.  The Defendant also exchanged text messages with other individuals in which the Defendant discussed his sexual interest in, and attraction to, Minor Victim 1, Minor Victim 3, Minor Victim 5, and Minor Victim 8.  The rest of the female minor victims (Minor Victim 4, Minor Victim 6, and Minor Victim 7) were of the same age and gender as the victims in whom the Defendant explicitly expressed sexual interest.

Minor Victim 3 was a relative of the Defendant.  Beginning in September 2012, the Defendant placed hidden cameras in the bathroom that Minor Victim 3 used when she visited the Defendant's residence.  The camera was aimed at the shower and was positioned in a manner that permitted the Defendant to capture videos of Minor Victim 3 when she was naked and

5

entering or exiting the shower.  As previously noted, the Defendant's text messages show the Defendant's sexual interest in Minor Victim 3.  Minor Victim 3 also disclosed the fact that the Defendant and his friends, including Jason Woods who is discussed further below (*see infra* at 9), groomed her over a period of years, beginning when she was 11 or 12 years old.  This grooming included discussions of Minor Victim 3's virginity, conversations with Minor Victim 3 about Indiana's "Romeo and Juliet" law, and lamenting the fact that Minor Victim 3 was not yet 16 (the age of consent in Indiana).  In addition, the fact that many of the videos of Minor Victim 3 were "videos of a video" (i.e., recordings of a video of Minor Victim 3 that was playing on the Defendant's computer screen), as well as the fact that many of the videos of Minor Victim 3 were saved on multiple devices, shows the Defendant's intent with respect to Minor Victim 3. The Defendant's intent with Minor Victim 3 is also apparent through the Defendant's manipulation of a video of Minor Victim 3.  Specifically, the Defendant cropped a video of Minor Victim 3 to make her exposed genitals the focus of the video.

Minor Victim 4 was friend of Minor Victim 3.  Minor Victim 4 was also a "favorite" of the Defendant's friend and co-conspirator, Jared Fogle.  In February 2015, the Defendant took a photograph/screenshot of a video of Minor Victim 4, where Minor Victim 4 is completely nude and her pubic area is visible to the camera, cropped and edited the photograph, and texted it to Fogle and another adult male.  In the text messages, the Defendant referred to Minor Victim 4 by name.  The Defendant admitted this conduct during a May 14, 2015 proffer session, as well as during the June 14, 2019 evidentiary hearing on his § 2255 petition.  (*See* Cause No. 1:16-cv-3515-TWP-MPB, Docket No. 100 at 26:9-26:16 (admission by the Defendant that he sent a still image of Minor Victim 4 to Jared Fogle via text message).)

The Defendant's text messages, as well as other electronic evidence from his computer and cell phones, illustrate the Defendant's sexual interest in Minor Victim 5, another member of the Defendant's family.  On multiple occasions, the Defendant used hidden cameras in the bathroom that Minor Victim 5 used, and the bedroom where Minor Victim 5 stayed, when she visited the Defendant to obtain video of Minor Victim 5 completely nude or engaged in sexual conduct.

Minor Victim 6 was a friend of Minor Victim 5.  In March 2013, when Minor Victim 6 was 14 years old, the Defendant used hidden cameras to obtain video of Minor Victim 6 completely nude while she exited the shower.  Minor Victim 6 is also depicted in videos in a bedroom where Minor Victim 6 is seen laying on a bed, masturbating with a body massager.

Minor Victim 7 was a friend of Minor Victim 3.  In April 2013, when Minor Victim 7 was 14 years old, the Defendant used a hidden camera in a bathroom to obtain video of Minor Victim 7 exiting the shower.  Of note, this video of Minor Victim 7 was created on the same day as video of Minor Victim 3, in whom the Defendant had demonstrated (and expressed) sexual interest.  And, as previously noted, Minor Victim 7 (as well as Minor Victim 6) are of the same age and gender as victims in whom the Defendant clearly expressed sexual interest.

Minor Victim 8 was another friend of Minor Victim 5.  The Defendant and Fogle both had sexual interest in Minor Victim 8, and they referred to her by a lewd nickname in text messages.  In July 2014, when Minor Victim 8 was 15 years old, the Defendant used hidden cameras in a bathroom to obtain video of Minor Victim 8 completely nude with her pubic area visible to the camera.

Minor Victim 12 was also a relative-in-law of the Defendant's and is the youngest of the victims.  As previously noted, the Defendant had a demonstrated sexual interest in Minor Victim

12, as evidenced by the photograph of his penis pressed up against a picture of Minor Victim 12's face.  In January 2015, when Minor Victim 12 was 9 years old, the Defendant used a hidden camera in his master bathroom to take video of Minor Victim 12 bathing after gymnastics. Minor Victim 12's naked pubic area is visible when she stands up to get out of the bathtub.

In addition, it is telling that, although the Defendant challenged his intent with respect to the male victims (Minor Victims 9, 10, and 11) in his § 2255 petition, the Defendant has *never* challenged his intent or denied his conduct with respect to the female victims (Minor Victims 1, 2, 3, 4, 5, 6, 7, 8 and 12).  To the contrary, the Defendant gave 3 proffer sessions in which he admitted to having sexual relations with Minor Victim 1 and Minor Victim 2, paying Minor Victim 1 and Minor Victim 2 for oral sex, and sending and showing nude images of Minor Victim 4 to Fogle and another adult male.

In addition to the child pornography that he produced in his home, the Defendant also downloaded and possessed commercial child pornography.  Much of the commercial child pornography was similar to what the Defendant produced in his home – shower videos, videos of children using the bathroom, and spycam-type hidden camera videos.  This further establishes the Defendant's intent with respect to Minor Victims 1-8 and 12.

In light of the foregoing, the Defendant is absolutely a danger to the community.  The Defendant preyed on children over a period of years, using them to fulfill his own perverse sexual desires.  The Defendant also provided child pornography to Jared Fogle, and to at least one other individual, which further victimized the children.  Perhaps most troubling is the fact that the Defendant victimized the children closest to him – members of his own family and their friends.  The Government firmly believes that if the Defendant is released from custody, he will continue to victimize and intimidate these children.

8

Indeed, the Defendant remains in custody and the Government has learned from several victims that they have been contacted by the Defendant's friends and family.  After the Court vacated the Defendant's conviction, the Defendant's father sent Minor Victim 5 a friend request on Facebook.  (Exhibit 1, Exhibit 2.)  As set forth above, Minor Victim 5 is one in whom the Defendant was clearly sexually attracted.  Further, the Defendant's father is not blood or legal relative of Minor Victim 5, and has had no relationship or contact with Minor Victim 5 from approximately 2015 until the attempted contact in March 2020.

In addition, in March 2020, the mother of Minor Victims 10 and 11 received text messages from an unknown telephone number that she believes belongs to the Defendant's father.  (Exhibit 3.)  While Minor Victims 10 and 11 are blood relatives of the Defendant, the timing is certainly suspect.

Even before the Defendant's conviction was vacated, Minor Victim 3 was contacted by Jason Woods.  (Exhibit 4.)  Mr. Woods is the self-described "BFF" of the Defendant, and even so-referenced that fact in his attempt to contact Minor Victim 3.  (*See* Exhibit 4 (stating that he is "Russell's BFF").)  In addition, Mr. Woods is one of the adults who groomed Minor Victim 3, beginning when she was 11 or 12 years old.  (*See supra* at 6).  After this attempt, Minor Victim 3 did not reply.  Undeterred, Mr. Woods also attempted to contact Minor Victim 3 via Instagram in May 2019.  (Exhibit 5, Exhibit 6.)  Mr. Woods's only connection to Minor Victim 3 is the Defendant, and Mr. Woods told Minor Victim 3 via Facebook that she did not need to tell anyone that he was contacting her.  (*See* Exhibit 4 (stating "You don't have to tell anyone that I contacted you . . .").)

Minor Victim 3 and Minor Victim 5 also recently disclosed to the Government threats that the Defendant made to them and to his then-wife, Angela Taylor prior to his arrest.[2] Specifically, Minor Victim 3 told the Government that the Defendant threatened to kill her and her family on numerous occasions.  Minor Victim 3 said "if you didn't play your part in Russell's movie then you were dead," or words to that effect.  Minor Victim 5 corroborated these statements and also recalled the Defendant making threats against Minor Victim 5 and her family.  In addition, Minor Victim 3 and Minor Victim 5 both stated that Angela Taylor confided in them about physical abuse Ms. Taylor suffered at the hands of the Defendant.  Although Minor Victim 3 and Minor Victim 5 did not witness the abuse, they both saw evidence of physical abuse on Ms. Taylor, including black eyes and a swollen lip.  Finally, Minor Victim 3 and Minor Victim 5 reported that while the Defendant was married to Ms. Taylor, the Defendant slept with a handgun in his bedside table.  Minor Victim 3 and Minor Victim 5 stated that the handgun was intended as a threat towards them and towards Ms. Taylor.

It simply cannot be overstated – the Defendant's victims are terrified of him.  At least 2 victims are expected to exercise their statutory rights to appear at the March 31, 2020 detention hearing, and *all* of the victims have expressed fear of what might happen if the Defendant were released.

The Defendant is also a serious risk of flight.  The Defendant, through his family, has the financial means to flee, and he most certainly has a reason to do so.  The Defendant has been in

---

[2] Although Minor Victim 3 and Minor Victim 5 were interviewed after the Defendant's arrest in 2015, they were never asked about threats, abuse, or violence by or from the Defendant.  When Minor Victim 3 and Minor Victim 5 were contacted and informed that the Defendant's convictions had been overturned and the case was being re-prosecuted, they informed the Government about things they saw, heard, and experienced in 2015, and prior.

prison since 2015, so he knows what is coming his way if he is convicted of the instant charges. The crimes the Defendant is currently charged with are punishable by 15-30 years in prison. Given the number and ages of the Defendant's victims, as well as the nature of the Defendant's conduct, the Government expects that the Defendant's sentencing guidelines would actually be *above* the 30-year statutory cap. This certainly provides motivation for the Defendant to flee.

Finally, the change in circumstances resulting from the COVID-19 outbreak makes it more likely that the Defendant could slip away undetected if he were released on conditions. Resources are currently in short supply, and attention (including the attention of law enforcement officers) is focused on addressing the ongoing pandemic. And, to be clear, the existence of the COVID-19 outbreak does not cut against pretrial detention as it does not change the core fact that releasing the Defendant under any circumstances represents an unacceptable danger to our community and a substantial risk of nonappearance at future proceedings. Moreover, releasing the Defendant will not insulate him from COVID-19 – the virus is in every state and most communities. As the United States District Court for the Central District of California recognized: "[T]he COVID-19 pandemic is gripping the nation. But that is a fate that affects all citizens . . . not simply those incarcerated." *United States v. Rodriguez*, Cause No. CR 11-148-JTS, Docket No. 2020 (C.D. Cal. Mar. 21, 2020). Prisons, jails, and other custodial facilities are implementing procedures to counter the spread of the COVID-19 virus. This includes monitoring employees and inmates for symptoms of respiratory infections, screening new inmates for signs of respiratory infections and implementing appropriate infection prevention practices, suspending visits, conducting attorney/client meetings by video conference or "through the glass" meetings, frequently disinfecting high-traffic areas, and establishing and stocking hand sanitizer stations. Finally, given the publicly available data, federal detainees in this district

11

(who are being held principally in facilities in Indiana and Kentucky) have a *lower* risk of contracting COVID-19 than members of the general public.  While there are numerous confirmed cases of COVID-19 in Indiana and Kentucky, as of March 23, 2020, there are *no* confirmed COVID-19 cases among the detained populations in either Indiana or Kentucky.

**2.      Weight of the Evidence**

As the Court can see, the evidence against the Defendant is strong and consists of photographic and video evidence of the Defendant's conduct, forensic evidence, testimony from the Defendant's victims, and the Defendant's own statements from the § 2255 hearing and proffer sessions described above.  As to the victim testimony, much of it can be corroborated either through videos or images that depict the Defendant's illegal actions, or through the testimony of other victims.

**3.      Character and Ties to the Community**

The Government concedes that the Defendant has lived in the Southern District of Indiana for years.  However, the victims also reside in this district and, in many cases, are related to the Defendant.  Thus, to the extent this factor may tip slightly in the Defendant's favor, it is certainly not enough to render the Defendant non-dangerous or change the fact that the Defendant is a risk of flight.

**4.      Nature and Seriousness of the Danger Posed**

As stated above, the Defendant preyed on the children closest to him over a period of years.  He, through his family, has now attempted to intimidate these children (many of whom are now adults and have lost some of the protections afforded to them through their parents or guardians) into silence.  The Defendant is dangerous and his release poses a serious threat to the community, as well as to his victims.

**Conclusion**

Based upon the foregoing, even if the Defendant is able to rebut the presumption of detention, the Government has demonstrated clearly and convincingly that he is a danger to any other person in the community, and by a preponderance that he is a risk of flight.  Due to the danger posed, there are no conditions that can mitigate this risk and the Defendant should be detained pending trial in this matter.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

By:      s/ Kathryn E. Olivier
          Kathryn E. Olivier
          Assistant United States Attorney

13

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 30, 2020, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to the following parties by operation of the Court's electronic

filing system.  Parties may access this filing through the Court's system.

Zachary Lee Newland
zach@brandonsample.com

Brandon Sample
brandon@brandonsample.com

By:    s/ Kathryn E. Olivier
          Kathryn E. Olivier
          Assistant United States Attorney
          Office of the United States Attorney
          10 W. Market Street, Suite 2100
          Indianapolis, IN 46204-3048
          Telephone: (317) 226-6333
          Fax:  (317) 226-6125
          Email:  Kathryn.Olivier@usdoj.gov